UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br><br>                    Plaintiff,<br><br>v.<br><br>SAFETY CAPITAL MANAGEMENT, INC. (d/b/a "FOREXNPOWER"), GNS CAPITAL, INC. (d/b/a "FOREXNPOWER"), JOHN H. WON, SUNGMI KANG, and TAE HUNG KANG (a/k/a "KEVIN KANG"),<br><br>                    Defendants. | Case No.:  **15-CV-5551**<br><br>ECF CASE<br><br>**COMPLAINT FOR INJUNCTIVE and OTHER EQUITABLE RELIEF, RESTITUTION and CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff, U.S. Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.    SUMMARY

1.      From at least October 2010 through December 2013 (the "Relevant Period"), Defendants John H. Won, Sungmi Kang, Tae Hung Kang (a/k/a "Kevin Kang"), Safety Capital Management, Inc. ("Safety") and GNS Capital, Inc. ("GNS") (collectively d/b/a "FOREXNPOWER"), directly or through their officers, employees or agents, while acting as commodity trading advisors ("CTAs") and commodity pool operators ("CPOs"), fraudulently solicited customers and prospective customers for the purported purpose of trading a pooled investment in connection with agreements, contracts, or transactions in off-exchange foreign currency ("forex") and/or to open retail forex accounts purportedly managed by either Safety or GNS.  In furtherance of the fraudulent scheme, Defendants made material misrepresentations and omissions in solicitations to actual and prospective customers, including but not limited to falsely

guaranteeing 10% profits per month with no risk of loss.  Rather than trading forex on their customers' behalf, Defendants misappropriated customers' funds for Defendants' personal use and benefit, and operated as a "Ponzi" scheme by paying customers from the funds of other customers.

2.      During the Relevant Period, Defendants Safety and GNS, by and through their officers, employees or agents, fraudulently solicited and accepted over $1.5 million from over 90 customers, who were neither eligible contract participants ("ECPs") nor eligible commercial entities ("ECEs"), for both the forex commodity pool and individually managed retail forex accounts.

3.      Total deposits by Safety and GNS's pool participants into the forex commodity pool were approximately $718,000.  Of this amount, Defendants Sungmi Kang and John Won misappropriated over $622,000 from at least 37 pool participants, and used the funds for personal and business expenses rather than for forex trading.  Total deposits by Safety and GNS's managed retail forex account customers were approximately $845,000 from at least 50 customers.  These retail forex customers lost a total of nearly $400,000 in these managed retail forex accounts, while Safety and GNS were compensated for purportedly managing and trading the accounts.

4.       During the Relevant Period, Defendant Tae Hung Kang personally solicited both individually managed retail forex account customers and forex pool participants by, among other misrepresentations, making false guarantees of 10% profit per month without risk of loss when, in reality, Safety and GNS's customers had lost money in the forex commodity pool and in the managed retail forex accounts.

5.     During the Relevant Period, Defendants Safety and GNS also failed to operate the commodity pool as a separate legal entity – by receiving pool funds in Safety or GNS's name rather than the name of the commodity pool, and by commingling pool funds with non-pool property – and failed to register with the Commission as commodity pool operators ("CPOs") and commodity trading advisors ("CTAs").

6.     By virtue of this conduct and the conduct further described herein, Defendants, either directly or as controlling persons, have engaged, are engaging, or are about to engage in acts and practices in violation of Sections 2(c)(2)(C)(iii)(I)(aa)-(cc), 4b(a)(2)(A) and (C), 4m(1), and 4o(1)(A)-(B) of the Commodity Exchange Act (the "Act") as amended, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(aa)-(cc), 6b(a)(2)(A) and (C), 6m(1), and 6o(1)(A)-(B)(2014), and Commission Regulations ("Regulations") 4.20(a)-(c), 5.2(b), and 5.3(a)(2)-(3), 17 C.F.R. §§ 4.20(a)-(c), 5.2(b), and 5.3(a)(2)-(3).

7.     Moreover, in October 2014, Defendant GNS failed to respond to a Commission subpoena requesting documents.  By this conduct, GNS violated Commission Regulation 1.31, 17 C.F.R. § 1.31 (2014).

8.     During the Relevant Period, Defendants Sungmi Kang, Tae Hung Kang, and John Won were officers, employees and agents of Safety.  Therefore, Safety is liable for the acts and omissions of Sungmi Kang, Tae Hung Kang, and John Won done in the scope of their employment or office, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

9.     During the Relevant Period, Defendants John Won and Sungmi Kang were officers, employees and agents of GNS.  Therefore, GNS is liable for the acts and omissions of

John Won and Sungmi Kang done in the scope of their employment or office, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

10.     Defendant Sungmi Kang was a controlling person of Safety throughout the Relevant Period and did not act in good faith or knowingly induced Safety's violations of the Act and Regulations described herein.  Therefore, Sungmi Kang is liable for Safety's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

11.     Defendants John Won and Sungmi Kang were controlling persons of GNS throughout the Relevant Period and did not act in good faith or knowingly induced GNS's violations of the Act and Regulations.  Therefore, John Won and Sungmi Kang are liable for GNS's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

12.     Accordingly, pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1 (2012), and Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2012), the Commission brings this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act and the Regulations promulgated thereunder, and to enjoin them from engaging in any commodity related activity.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary and appropriate.

13.     Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

## II.     JURISDICTION AND VENUE

14.     Section 6c(a) of the Act, 7 U.S.C. § 13a-1 (2012), authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder.

15.     The CFTC has jurisdiction over the conduct and forex transactions at issue in this case pursuant to Section 2(c)(2)(C) of the Act, 7 U.S.C. §§ 2(c)(2)(C).

16.     Venue lies properly with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants resided and/or transacted business in this District, several defrauded customers reside in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.

## III.     THE PARTIES

17.     Plaintiff **U. S. Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1 *et seq*., and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq*.

18.     Defendant **Safety Capital Management, Inc.**, which did business as "FOREXNPOWER," is a New York corporation with its last known place of business at 216-19 Northern Blvd., Suite 2, Bayside, NY 11361.  Safety has never been registered with the Commission in any capacity.

19.     Defendant **GNS Capital, Inc**., which also did business as "FOREXNPOWER," is a New York Corporation with its last known place of business at 216-19 Northern Blvd., Suite 2, Bayside, NY 11361.  GNS had the same business address, employees, and agents as Safety.

GNS has been registered with the Commission as a CTA and CPO from October 21, 2013 to the present.

20.     Defendant **John H. Won** is a resident of Queens, New York and President of GNS.  John Won was also a Vice-President and Secretary of Safety.  Since June 27, 2013, John Won has been listed by the National Futures Association ("NFA") as a principal and owner of GNS.  Between August 2013 and February 2014, John Won was also registered with the Commission as an Associated Person ("AP") and Branch Manager of a registered Introducing Broker ("IB").

21.     Defendant **Sungmi Kang** is a resident of Queens, New York and was the President of Safety and the Vice-President of GNS.  Sungmi Kang has never been registered with the Commission in any capacity.

22.     Defendant **Tae Hung Kang** (a/k/a "Kevin Kang") is a resident of Queens, New York and was the Chief Executive Officer ("CEO") of Safety.  On information and belief, Tae Hung Kang is the husband of Sungmi Kang.  Tae Hung Kang has never been registered with the Commission in any capacity.

### IV.    <u>STATUTORY AND REGULATORY BACKGROUND</u>

23.     Section 1a(11) of the Act, 7 U.S.C. § 1a(11), defines a CPO, in relevant part, as any person "engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any … agreement, contract, or transaction described in [S]ections 2(c)(2)(C)(i) or 2(c)(2)(D)(i) [of the Act, 7 U.S.C. §§ 2(c)(2)(C)(i) or 2(c)(2)(D)(i)]."

24.     Section 1a(12) of the Act, 7 U.S.C. § 1a(12), defines a CTA, in pertinent part, as any person who "for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in . . . any agreement, contract, or transaction described in [S]ection 2(c)(2)(C)(i) or 2(c)(2)(D)(i)1a-1 [of the Act, 7 U.S.C. §§ 2(c)(2)(C)(i) or 2(c)(2)(D)(i)1a-1]."

25.     Section 2(c)(2)(C)(i) and (vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(i) and (vii), provides in pertinent part, and subject to certain exceptions not relevant here, that the Commission has jurisdiction over forex transactions if the transactions are offered to or entered into with a person that is not an ECP or ECE on a leveraged or margined basis, and the transactions do not result in actual delivery within two days or otherwise create an enforceable obligation to make/take delivery in connection with the parties' line of business.

26.     Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi), defines an ECP, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.  Section 1a(17) of the Act, 7 U.S.C. § 1a(17), defines an ECE as an ECP that meets certain additional requirements, both financially and in its business.

27.     Pursuant to Section 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc), and subject to certain exceptions not relevant here, an entity must be registered pursuant to Commission regulation in order to operate or solicit funds for any pooled investment in connection with forex transactions.

28.     Pursuant to Commission Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1), and subject to certain exceptions not relevant here, any person who operates or solicits funds, securities or

property for a pooled investment vehicle and engages in retail forex transactions is defined as a retail forex CPO.

29.     Regulation 5.1(e)(1), 17 C.F.R. § 5.1(e)(1), defines a retail forex CTA as any person who exercises discretionary trading authority or obtains written authorization to exercise discretionary trading authority over any account for or on behalf of any person that is not an ECP, in connection with retail forex transactions.  Regulation 5.3(a)(3)(i), 17 C.F.R. § 5.3(a)(3)(i), requires any retail forex CTA, as defined by Regulation 5.1(e)(1), to register with the Commission as a CTA.

30.     Regulation 5.1(i), 17 C.F.R. § 5.1(i), defines a retail forex account as the account of a person who is not an ECP, established with a retail foreign exchange dealer or a futures commission merchant, in which account retail forex transactions (including options on contracts for the purchase or sale of foreign currency) with such retail foreign exchange dealer or futures commission merchant as counterparty are undertaken, or which account is established in order to enter into such transactions.

31.     A futures commission merchant ("FCM") is defined in Section 1a(28) of the Act, in pertinent part, as any individual, association, partnership, corporation, or trust that engaged in soliciting or accepting orders for any agreement, contract, or transaction described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i).

32.     Regulation 5.1(k), 17 C.F.R. § 5.1(k), defines a retail forex customer as a person, other than an ECP, acting on its own behalf and trading in any account, agreement, contract or transaction described in Sections 2(c)(2)(B) or 2(c)(2)(C) of the Act, 7 U.S.C. §§ 2(c)(2)(B) or 2(c)(2)(C).

33.     Regulation 5.1(m), 17 C.F.R. § 5.1(m), defines a retail forex transaction as any account, agreement, contract or transaction described in Sections 2(c)(2)(B) or 2(c)(2)(C) of the Act, 7 U.S.C. §§ 2(c)(2)(B) or 2(c)(2)(C).  A retail forex transaction does not include an account, agreement, contract or transaction in foreign currency that is a contract of sale of a commodity for future delivery (or an option thereon) that is executed, traded on or otherwise subject to the rules of a contract market designated pursuant to section 5(a) of the Act.

## V.    FACTS

**A.     Defendants' Fraudulent Solicitation and Misappropriation**

34.     During the Relevant Period, Safety and GNS (collectively d/b/a FOREXNPOWER), by and through their officers, employees or agents, fraudulently solicited customers and potential customers to invest in a commodity pool for forex trading and/or to open retail forex trading accounts purportedly managed by Safety and GNS.  The fraudulent solicitation included, but was not limited to, misrepresentations by the Defendants that FOREXNPOWER had a "secret trading method" called ASET that guaranteed customers would obtain a "monthly profit rate of 10%;" that investors "will not lose their money at all, not even $1;" and that customers would make $100,000 with only a $500 investment.  These misrepresentations of guaranteed profits and no risk were false and misleading, as none of Defendants' customers had ever obtained 10% monthly profits, and many of the customers experienced large losses.

35.     Defendants Safety and GNS, by and through their officers, employees or agents, made the misrepresentations in advertisements placed in Korean language newspapers, on their website www.forexnpower.com, in written solicitation materials, and at seminars they hosted in Queens, New York.

36.     At the seminars that Defendants Safety and GNS hosted during the Relevant Period, their principals, employees and agents, including Defendant Tae Hung Kang, made similar fraudulent statements to customers and prospective customers.

37.     For example, on or about March 15, 2012, Defendant Tae Hung Kang solicited pool participants and retail forex customers at a FOREXNPOWER seminar and represented that he was the CEO of the company and that the ASET program would in 5 years turn a $3,000 investment into over $900,000 in profits.

38.     On another occasion, in or around the summer of 2012, Defendant Tae Hung Kang, again representing himself as the CEO of FOREXNPOWER, falsely stated to a customer that the company had yielded 10% profits per month and encouraged the customer to invest because this was a "lifetime opportunity" and the customer should "not miss out."  After this customer invested, he requested a withdrawal.  Tae Hung Kang told the customer that he could pay the customer back in few weeks because the company was expecting an investment from another investor.  This latter representation is consistent with a Ponzi scheme in which investors are paid with other investors' money.

39.     In yet another false solicitation, in an email dated January 11, 2013, Defendants Safety and GNS, using the d/b/a FOREXNPOWER, by and through their officers, employees or agents, represented to customers that during the entire month of December 2012, all their managed forex trading accounts had made a profit of 10% on average.  On the contrary, during this period, the majority of FOREXNPOWER'S managed retail forex customer accounts lost money.

40.     Through the false solicitations described above, Defendants Safety and GNS, by and through their officers, employees, and agents, fraudulently solicited and obtained

approximately $718,000 from at least 37 persons to invest in a forex commodity pool.  The majority of pool funds were deposited into Safety's bank account (which was controlled by Defendant Sungmi Kang).  GNS also received in its bank account (controlled by Defendants John Won and Sungmi Kang) at least $50,000 from a pool participant.

41.     Defendant Sungmi Kang was the sole signatory of Safety's bank account. Defendants John Won and Sungmi Kang were both signatories on GNS's bank account.

42.     Defendants Safety and GNS, by and through their officers, employees or agents, represented to pool participants that they would use pool funds to trade retail off-exchange forex transactions on behalf of the participants.  In fact, the majority of pool funds were not used for forex trading but for Defendants' personal and business expenses.

43.     Defendants Sungmi Kang and John Won, through their control over Safety's and GNS's bank accounts, misappropriated over $622,000 in pool participants' funds for personal and business expenses, including cash withdrawals, checks to their personal bank accounts, entertainment and meals, and Ponzi payments (i.e., payments of purported trading profits to investors using funds of other investors).  In total, Defendants Safety and GNS, collectively, paid at least $80,000 in Ponzi payments.

44.     Defendants, either directly or as controlling persons, did not disclose to the pool participants that the majority of their funds were actually misappropriated and never used for forex trading.  Defendants John Won and Sungmi Kang knew or should have known the majority of pool funds were misappropriated and not used for forex trading because they controlled Safety and GNS's bank accounts and trading.

45.     During the Relevant Period and using the same false solicitations described above, Defendants Safety and GNS, by and through their officers, employees and agents, also solicited retail customers to open managed forex trading accounts with an FCM.

46.     Safety and GNS received commissions for managing these retail forex accounts.

47.     All or nearly all of Safety and GNS's retail forex customers were not ECEs or ECPs as defined by Sections 1a(17)-(18) of the Act, 7 U.S.C. §§ 1a(17)-(18).

48.     Defendants Safety and GNS's retail forex customers deposited a total of approximately $845,000 into their managed retail forex accounts and lost nearly $400,000 (including commissions and fees) through trading of retail forex transactions.  At the same time, Safety and GNS made commissions on these managed retail forex accounts.

**B.     Commingling Pool Funds and Failure to Operate Pool as Separate Entity**

49.     Safety and GNS, while acting as CPOs, also failed to operate their commodity pool as a separate legal entity, and commingled pool funds with non-pool property by depositing pool funds into the bank accounts of Safety and GNS rather than a separate bank account for the pool.

**C.     Defendants' Failure to Register With the Commission**

50.     During the Relevant Period, Defendants Safety and GNS, by and through their officers, employees or agents, used the mails, emails, wire transfers, the FOREXNPOWER website, newspaper advertisements and other means or instrumentalities of interstate commerce, to solicit pool participants and prospective pool participants, and misappropriated pool participants' funds that were deposited in bank accounts controlled by Safety and GNS.

51.     Safety was never registered as a CPO, and GNS became a registered CPO (and CTA) only on or about October 21, 2013.  During the Relevant Period, Safety, and GNS (prior to

12

its registration on or about October 21, 2013) acted as CPOs by soliciting and accepting pool funds.

52.     During the Relevant Period, Safety and GNS (during its unregistered period) were not statutorily exempt or excluded from registration as CPOs.  Moreover, Safety and GNS never filed any electronic or written notice with NFA that they were exempt or excluded from registration as CPOs, as required by Commission Regulation 4.13(b)(1).

53.     In addition, Defendants Safety and GNS also acted as CTAs by collectively managing the retail forex trading accounts of at least 55 clients.

54.     During the Relevant Period, Safety and GNS acted as CTAs by providing retail forex trading advice for compensation or profit, and used the mails, emails, or other means or instrumentality of interstate commerce to solicit retail forex customers and manage retail forex accounts.  Safety had trading authority over at least five such client accounts and GNS had trading authority over at least 50 such client accounts.

55.     During the Relevant Period, Safety and GNS (prior to October 21, 2013) were not registered with the Commission as CTAs, nor were Safety and GNS exempt or excluded from registration as CTAs.  Moreover, even if they were eligible for exemption or exclusion from registration, Safety and GNS never filed written or electronic notice with NFA that they were exempt or excluded from registration as CTAs.

**D.      Controlling Person Liability**

56.     Defendant Sungmi Kang was a controlling person of Safety during the Relevant Period.  Sungmi Kang was the President of Safety and was the sole signatory on Safety's bank account.  Sungmi Kang also had trading authority over Safety's managed retail forex accounts.

57.     During the Relevant Period, Defendant Sungmi Kang did not act in good faith by misappropriating Safety customer funds or knowingly induced Safety, its officers, employees or agents, to make the misrepresentations described above about guaranteed profits without risk of loss. Sungmi Kang knew or should have known that Safety's customers had never obtained 10% profits per month and that she had been misappropriating customer funds. Sungmi Kang failed to remove or correct Defendants' misrepresentations and failed to disclose the misappropriation of customer funds.

58.     During the Relevant Period, Defendants John Won and Sungmi Kang were controlling persons of GNS. GNS was formed by John Won. John Won was the President and Sungmi Kang was the Vice-President of GNS. Both John Won and Sungmi Kang were signatories on GNS's bank account, and John Won had trading authority over the retail forex trading accounts managed by GNS.

59.     Defendants John Won and Sungmi Kang did not act in good faith by misappropriating GNS customer funds and depositing the funds into GNS's bank account, or knowingly induced GNS and its officers, employees or agents to make the misrepresentations described above about guaranteed profits without risk of loss. John Won and Sungmi Kang knew or should have known that GNS's customers had never obtained 10% profits per month and that they had been misappropriating customer funds. John Won and Sungmi Kang failed to remove or correct Defendants' misrepresentations and failed to disclose the misappropriation of customer funds.

### E.     GNS's Failure to Respond to a CFTC Subpoena

60.     In April 2014, the Commission's Division of Enforcement served, via UPS overnight delivery and email, an administrative subpoena (returnable on August 4, 2014) for

documents on GNS, at both its registered business address and at the home address of Defendant John Won, GNS's President.  At the time, GNS was registered with the Commission as a CPO and CTA and John Won was its principal.

61.     John Won verbally acknowledged to Commission staff that he had received the subpoena to GNS.  However, GNS and its principal, John Won, failed to produce documents or otherwise respond to the Commission's subpoena, and John Won did not act in good faith or knowingly induced GNS's failure to comply with the Commission subpoena.

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

**Violations of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A) and (C), and Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1) and (3)**
**(Commodities/Forex Fraud by Misrepresentations, Omissions, and Misappropriation)**

62.     Paragraphs 1 through 61 are realleged and incorporated herein by reference.

63.     Section 4b(a)(2)(A) and (C) of the Act, as amended, 7 U.S.C. § 6b(a)(2)(A) and (C), makes it unlawful "for any person, in or in connection with any order to make, or the making of, any contract for sale of any commodity for future delivery . . . that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; . . . (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to an order or contract for or, in the case of paragraph (2), with the other person."

64.     Pursuant to Section 2(c)(2)(C)(iv) of the Act, as amended, 7 U.S.C. § 2(c)(2)(C)(iv), Section 4b of the Act applies to the forex transactions described herein "as if" they were a contract of sale of a commodity for future delivery.

65.     Commission Regulation 5.2(b), 17 C.F.R. § 5.2(b), provides, in relevant part, that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (1) to cheat or defraud or attempt to cheat or defraud any person; . . . or (3) [w]illfully to deceive or attempt to deceive any person by any means whatsoever."

66.     Defendants Safety and GNS violated Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A) and (C), and Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1) and (3), by and through their officers, employees, and agents, by making false representations and omissions including but not limited to (1) misrepresenting to customers and pool participants or prospective customers and pool participants that customers and participants were guaranteed to obtain 10% profits per month in connection with off-exchange retail forex transactions without risk of loss; (2) misrepresenting that customers and prospective customers would obtain $100,000 in profit from a $500 investment; and by (3) misappropriating customer funds for personal and business expenses rather than trading retail forex transactions and failing to disclose that customer funds had been misappropriated.

67.     In soliciting customers and pool participants of Defendants Safety and GNS, Defendant Tae Hung Kang directly violated Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A) and (C), and Commission Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1) and (3), by falsely representing that Safety and GNS had and would obtain 10% profits per month

without any risk of loss, when forex pool participants and retail forex customer accounts managed by the companies had never earned such profits and had in fact lost money.

68.     Defendants Sungmi Kang and John Won directly violated Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A) and (C), and Commission Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1) and (3), by misappropriating funds of Safety and GNS's customers for personal and business expenses rather than for forex trading.

69.     The foregoing acts, omissions, and failures occurred within the scope of John Won, Sungmi Kang, and Tae Hung Kang's employment or office with Safety and/or GNS. Therefore, Safety and GNS are liable for their acts, omissions, and failures pursuant to Section 2(a)(1)(B) of the Act, as amended, 7 U.S.C. § 2(a)(1)(B), and Commission Regulation 1.2, 17 C.F.R. § 1.2.

70.     Defendant Sungmi Kang held and exercised direct and indirect control over Safety and either did not act in good faith or knowingly induced Safety's violations of Sections 4b(a)(2)(A) and (C), 7 U.S.C. § 6b(a)(2)(A) and (C), and Commission Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1) and (3).  As a controlling person of Safety, Sungmi Kang is liable for Safety's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

71.     John Won and Sungmi Kang held and exercised direct and indirect control over GNS, and either did not act in good faith or knowingly induced GNS's violations of Sections 4b(a)(2)(A) and (C), 7 U.S.C. § 6b(a)(2)(A) and (C), and Commission Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1) and (3).  As controlling persons of GNS, John Won and Sungmi Kang are liable for GNS's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

72.     Each misrepresentation, omission of material fact, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A) and (C).

## COUNT TWO

### Violation of Section 4o(1)(A) -(B) of the Act, 7 U.S.C. § 6o(1)(A)-(B)
### (Fraud and Deceit by a CTA or CPO)

73.     Paragraphs 1 through 72 are re-alleged and incorporated herein by reference.

74.     During the Relevant Period, Safety and GNS engaged in a business, for compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including in relevant part transactions in foreign currency.  Therefore, Safety and GNS acted as CPOs as defined by Section 1a(11) of the Act, 7 U.S.C. § 1a(11).

75.     An Associated Person ("AP") of a CPO is defined by Regulation 1.3(aa)(3) as any person who is a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged.  An AP of a CTA is defined by Regulation 1.3(aa)(4) as any person who is partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves: (i) the solicitation of a client's or prospective client's discretionary account, or (ii) the supervision of any person or persons so engaged.  During the Relevant Period, Defendants Sungmi Kang, Tae Hung Kang and John Won acted as APs of Safety and GNS.

18

76.     During the Relevant Period, Safety and GNS engaged in the business of advising others, for compensation or profit, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery, security futures products, forex contracts or swaps for compensation or profit. Therefore, Safety and GNS acted as CTAs as defined by Section 1a(12) of the Act, 7 U.S.C. § 1a(12).

77.     During the Relevant Period, Safety, and GNS (prior to October 21, 2013), were not registered with the Commission as either CPOs or CTAs.

78.     Section 4o(1) of the Act, 7 U.S.C. § 6o(1), prohibits CTAs and CPOs, and APs of CTAs and CPOs, whether registered with the Commission or not, from using the mails or any means or instrumentality of interstate commerce, directly or indirectly, from (A) employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, and/or (B) engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or participant or prospective client or participant.

79.     While acting as CPOs and CTAs, Defendants Safety and GNS, by and through their officers, agents or employees, knowingly or recklessly: (1) misrepresented to pool participants and retail forex clients that they were guaranteed to make 10% profits per month trading without risk of loss; (2) misrepresented to pool participants and retail forex customers that they would obtain $100,000 in profit on a $500 investment, among other misrepresentations; and (3) misappropriated customer funds; and (4) omitted to disclose these misappropriations. Therefore, Safety and GNS violated Section 4o(1) of the Act, 7 U.S.C. § 6o(1).

80.     As described above, Defendants Sungmi Kang and John Won, directly violated Section 4o(1)(A)-(B), 7 U.S.C. § 6o(1)(A)-(B), by misappropriating customer funds.  Defendant

Tae Hung Kang directly violated Section 4o(1)(A)-(B) by making false representations to customers and prospective customers.

81.     The foregoing acts, omissions, and failures of Defendants John Won, Sungmi Kang, and Tae Hung Kang occurred within the scope of their employment or office with Safety and GNS.  Therefore, Safety and GNS are liable for their acts, omissions, and failures pursuant to Section 2(a)(1)(B) of the Act, as amended, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

82.     Defendant Sungmi Kang held and exercised direct and indirect control over Safety and either did not act in good faith or knowingly induced Safety's violations of Section 4o(1)(A)-(B), 7 U.S.C. § 6o(1)(A)-(B).  As a controlling person of Safety, Sungmi Kang is liable for Safety's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

83.     Defendants John Won and Sungmi Kang held and exercised direct and indirect control over GNS, and either did not act in good faith or knowingly induced GNS's violations of Section 4o(1)(A)-(B), 7 U.S.C. § 6o(1)(A)-(B).  As controlling persons of GNS, John Won and Sungmi Kang are liable for GNS's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

84.     Each misrepresentation, omission of material fact, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1).

## COUNT THREE

### Violation of Section 2(c)(2)(C)(iii)(I)(aa)-(cc) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa)-(cc)
### (Violation of Retail Forex Prohibitions)

85.     Paragraphs 1 through 84 are re-alleged and incorporated herein by reference.

86.     Section 2(c)(2)(C)(iii)(I)(aa), (bb) and (cc) prohibits a person, unless registered in the capacity as required in Commission rule, from soliciting or accepting orders from a non-ECP to conduct forex transactions, from exercising discretionary trading authority over forex transactions, or from operating or soliciting funds for a commodity pool in connection with transactions in foreign currencies.

87.     During the Relevant Period, Defendants Safety and GNS (prior to October 21, 2013 for GNS) were not registered as a CPO or CTA, while they solicited or accepted forex trading orders, exercised trading discretion of forex accounts, and solicited funds for a commodity pool which engaged in forex transactions.  Therefore, Defendants Safety and GNS were in violation of Section 2(c)(2)(C)(iii)(I)(aa), (bb) and (cc) of the Act.

88.     Defendants Sungmi Kang and John Won are also liable for Safety's and GNS's violations as controlling persons pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

## COUNT FOUR

### Violation of Regulation 4.20(a)-(c); 17 C.F.R. § 4.20(a)-(c)
### (Failure to operate pool as separate entity; failure to receive investor funds in pool's name; commingling pool funds)

89.     Paragraphs 1 through 88 are re-alleged and incorporated herein by reference.

90.     Commission Regulation 5.4, 17 C.F.R. § 5.4, states that Part 4 of the Regulations, 17 C.F.R. §§ 4.1, *et seq.*, apply to any person required to register as a CPO pursuant to Part 5 of the Regulations relating to forex transactions. 17 C.F.R. §§ 5.1, *et seq.*

91.     Commission Regulation 4.20(a), 17 C.F.R. § 4.20(a), requires a CPO, whether registered or not, to operate its commodity pool as a legal entity separate from that of the CPO.

92.     Commission Regulation 4.20(b), 17 C.F.R. § 4.20(b), prohibits CPOs, whether registered or not, from receiving pool participants' funds in any name other than that of the pool.

93.     Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c), prohibits a CPO, whether registered or not, from commingling the property of any pool it operates with the property of any other person.

94.     During the Relevant Period, Safety and GNS, while acting as CPOs, violated Commission Regulations 4.20(a)-(c), 17 C.F.R. § 4.20(a)-(c), by: (1) failing to operate a commodity pool as a legal entity separate from Safety and/or GNS; (2) receiving pool participants' funds in the names of either Safety or GNS rather than the commodity pool; and (3) commingling the property of the pool with property of Defendants or others.

95.     Defendant Sungmi Kang held and exercised direct and indirect control over Safety and either did not act in good faith or knowingly induced Safety's violations of Regulations 4.20(a)-(c), 17 C.F.R. § 4.20(a)-(c).  As a controlling person of Safety, Sungmi Kang is liable for Safety's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

96.     Defendants John Won and Sungmi Kang held and exercised direct and indirect control over GNS, and either did not act in good faith or knowingly induced GNS's violations of Regulations 4.20(a)-(c), 17 C.F.R. § 4.20(a)-(c).  As controlling persons of GNS, John Won and Sungmi Kang are liable for GNS's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

## COUNT FIVE

## Violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1); Regulation 5.3(a)(2)-(3), 17 C.F.R. § 5.3(a)(2)-(3)
### (Failure to Register as Retail Forex CPOs and CTAs)

97.     Paragraphs 1 through 96 are re-alleged and incorporated herein by reference.

98.     During the Relevant Period, Safety and GNS engaged in a business, for compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including in relevant part transactions in foreign currency.  Therefore, Safety and GNS acted as CPOs as defined by Section 1a(11) of the Act, 7 U.S.C. § 1a(11).

99.     During the Relevant Period, Safety, and GNS (prior to October 21, 2013), while using the mails or means of interstate commerce in connection with their business as CPOs, were not registered with the Commission as CPOs.  Thus, Safety, and GNS (prior to October 21, 2013), acted as unregistered CPOs in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1).

100.     During the Relevant Period, Safety and GNS solicited funds, securities, or property for a pooled investment vehicle from investors who were not eligible contract participants as defined by Section 1a(18) of the Act, 7 U.S.C. § 1a(18), and engaged in retail forex transactions (as defined by Regulation 5.1(m), 17 C.F.R. § 5.1(m)).  Thus, Safety and GNS acted as CPOs engaged in retail forex transactions as defined by Regulation 5.1(d)(1), 17 C.F.R. 5.1(d)(1), and were not otherwise exempt or excluded from registration as CPOs.  Because Safety and GNS were not registered with the Commission as CPOs engaged in retail forex transactions, they violated Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i).

101.     During the Relevant Period, Safety and GNS engaged in the business of advising

others, for compensation or profit, either directly or through publications, writings, or electronic

media, as to the value of or the advisability of trading in any contract of sale of a commodity for

future delivery, security futures product, forex contract or swap for compensation or profit, thus

Safety and GNS acted as CTAs as defined by Section 1a(12) of the Act, 7 U.S.C. § 1a(12).

102.     During the Relevant Period, Safety and GNS made use of the mails or other

means of interstate commerce in connection with their CTA and CPO businesses and were not

otherwise exempt or excluded from registration as CTAs or CPOs.  Because Safety and GNS

(prior to October 21, 2013) were not registered as CTAs, they violated Section 4m(1) of the Act,

7 U.S.C. § 6m(1).

103.     During the Relevant Period, Safety and GNS exercised discretionary trading

authority over retail forex transactions of persons who were neither ECEs nor ECPs as defined

by Section 1a(17) and (18) of the Act, 7 U.S.C. § 1a(17) and (18), and thus acted as CTAs

engaged in retail forex transactions as defined by Regulation 5.1(e)(1), 17 C.F.R. § 5.1(e)(1).

Because Safety and GNS (prior to October 21, 2013) were not registered as retail forex CTAs or

CPOs, they violated Regulation 5.3(a)(3)(i), 17 C.F.R. § 5.3(a)(3)(i).

104.     Sungmi Kang held and exercised direct and indirect control over Safety and either

did not act in good faith or knowingly induced Safety's violations of Section 4m(1) of the Act, 7

U.S.C. § 6m(1), and Regulation 5.3(a)(3)(i), 17 C.F.R. § 5.3(a)(3)(i).  As a controlling person

pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Sungmi Kang is liable for Safety's

violations of the Act and Regulations.

105.     Defendants John Won and Sungmi Kang held and exercised direct and indirect

control over GNS, and either did not act in good faith or knowingly induced GNS's violations of

Section 4m(1) of the Act, 7 U.S.C. § 6m(1), and Regulation 5.3(a)(3)(i), 17 C.F.R. § 5.3(a)(3)(i).

As controlling persons of GNS, John Won and Sungmi Kang are liable for GNS's violations of

the Act and Regulations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

## COUNT SIX

### Violation of Regulation 1.31, 17 C.F.R. § 1.31.
### (Failure to Produce Documents Upon Request from the CFTC)

106.    Paragraphs 1 through 105 are re-alleged and incorporated herein by reference.

107.    Regulation 1.31, 17 C.F.R. § 1.31, requires a registrant, *inter alia*, to open its

books and records to inspection by any representative of the Commission and produce its books

and records in a form specified by any representative of the Commission.  Such production shall

be made at the expense of the person required to keep the book or record, to a Commission

representative upon the representative's request.

108.    From October 21, 2013 to the present, GNS has been registered with the

Commission as a CTA and CPO.

109.    On or about July 24, 2014, the Commission's Division of Enforcement served a

document subpoena on GNS (returnable on August 4, 2014).  John Won, the principal of GNS,

acknowledged receipt of this subpoena to Commission staff.  However, GNS never responded to

the subpoena or produced its books and records, and thus GNS violated Commission Regulation

1.31, 17 C.F.R. § 1.31.

110.    John Won, who controlled the bank and trading accounts of GNS, held and

exercised direct and indirect control over GNS and either did not act in good faith or knowingly

induced GNS's violations of Regulation 1.3, 17 C.F.R. § 1.3.  John Won is therefore also liable

for GNS's violations as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. §

13c(b).

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.    Enter an order finding that:

   1)   Defendants violated Sections 4b(a)(2)(A) and (C), 4m(1),  4o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(aa)-(cc) of the Act, as amended, 7 U.S.C. §§ 6b(a)(2)(A) and (C), 6m(1), 6o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(aa)-(cc);

   2)   Defendants violated Regulations 4.20(a)-(c), 5.2(b)(1) and (3), and 5.3(a)(2)-(3), 17 C.F.R. §§ 4.20(a)-(c), 5.2(b)(1) and (3), and 5.3(a)(2)-(3); and

   3)   Defendant GNS and John Won violated Regulation 1.31, 17 C.F.R. § 1.31;

B.    Enter an order of permanent injunction restraining, enjoining and prohibiting Defendants, and any other person or entity in active concert with them, from engaging in conduct in violation of Sections 4b(a)(2)(A) and (C), 4m(1), 4o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(aa)-(cc) of the Act, as amended, 7 U.S.C. §§ 6b(a)(2)(A) and (C), 6m(1), 6o(1)(A)-(B), and 2(c)(2)(C)(iii)(I)(aa)-(cc); and Regulations 1.31, 4.20(a) and (c) and 5.2(b)(1) and (3) and 5.3(a)(2)-(3), 17 C.F.R. §§ 1.31, 4.20(a) and (c), 5.2(b)(1) and (3) and 5.3(a)(2)-(3);

C.    Enter an order of permanent injunction prohibiting Defendants and any other person or entity in active concert with them from, directly or indirectly:

   1)   Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

   2)   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. 1.3(yy) (2014), for accounts held in

the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3)  Having any commodity interests traded on any Defendant's behalf;

4)  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6)  Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9); and

7)  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9).

D.      Enter an order requiring Defendants, as well as any of their successors, to disgorge to any officer appointed by the Court all benefits received from acts or practices that constitute violations of the Act, as amended, and Regulations as described herein, including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

E.       Enter an order requiring Defendants, as well as their successors, to make full restitution, pursuant to such procedure as the Court may order, to every person or entity who sustained losses proximately caused by Defendants' violations (in the amount of such losses), as described herein, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

F.       Enter an order directing Defendants and any of their successors, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers whose funds were received by them as a result of the acts and practices which constituted violations of the Act, as amended, as described herein;

G.       Enter an order requiring each Defendant to pay a civil monetary penalty under the Act, to be assessed by the Court, in amounts of not more than the greater of (1) triple the monetary gain for each violation of the Act and Commission Regulations or (2) $140,000 for each violation of the Act and Commission Regulations;

H.       Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2012); and

I.      Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.

September 24, 2015


                                        Respectfully submitted,

                                        **PLAINTIFF U.S. COMMODITY
                                        FUTURES TRADING COMMISSION**


                                        By: /s/  Linda Y. Peng
                                             lpeng@cftc.gov
                                             Senior Trial Attorney

                                             W. Derek Shakabpa (pro hac vice
                                             application pending)
                                             wshakabpa@cftc.gov
                                             Senior Trial Attorney

                                             David Acevedo
                                             dacevedo@cftc.gov
                                             Chief Trial Attorney

                                             Manal Sultan
                                             msultan@cftc.gov
                                             Deputy Director

                                             Commodity Futures Trading Commission
                                             140 Broadway, 19th floor
                                             New York, NY 10005
                                             (646) 746-9733
                                             (646) 746-9940 (facsimile)