UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
U.S. COMMODITY FUTURES TRADING
COMMISSION,

       Plaintiff,

   -against-

SAFETY CAPITAL MANAGEMENT, INC.
(d/b/a FOREXNPOWER"), GNS CAPITAL,
INC. (d/b/a FOREXNPOWER"), and JOHN H.
WON,

       Defendants.
------------------------------------------------------------------ x

**REPORT & RECOMMENDATION**

15-cv-05551 (NGG) (PK)

**Peggy Kuo, United States Magistrate Judge:**

  The U.S. Commodity Futures Trading Commission ("Commission" or "CFTC") filed a civil Complaint against Defendants Safety Capital Management, Inc., (d/b/a "ForexnPower") ("Safety Capital"), GNS Capital, Inc. (d/b/a "ForexnPower") ("GNS"), John H. Won ("Won"), and Tae Hung Kang ("Kang") (collectively, "Defendants")[1] alleging violations of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2001) (the "Act") and Commission Regulations (the "Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2001). (Compl., Dkt. 1.) The Commission has moved for summary judgment against Won and Kang. ("Motion," Dkt. 56.) On August 31, 2022, a Final Judgment and Consent Order was entered against Kang, rendering the Motion against him moot. (*See* Dkt. 62.) The Honorable Nicholas G. Garaufis has referred the Motion against Won to me for a report and recommendation. (December 19, 2023 Order.) For the reasons below, I respectfully recommend that the Motion be GRANTED.

---

[1] The Complaint also named Sungmi Kang as a Defendant; she unfortunately has passed away. (*See* March 17, 2022 Order.)

1

**FACTUAL BACKGROUND**

The following facts are taken from the Complaint, the Commission's statement of facts filed pursuant to Local Civil Rule 56.1 ("CFTC 56.1," Dkt. 56-2), and exhibits filed in support of CFTC 56.1 (Dkts. 56-3–56-26). Because Won did not oppose the Motion or file a response to the CFTC's 56.1 statement, the facts in the CFTC's 56.1 Statement are deemed admitted for purposes of the Motion. *See* Local Civ. R. 56.1(c).

**I.   The Parties**

The Commission is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Regulations promulgated thereunder, with jurisdiction over certain off-exchange foreign currency ("forex") transactions. (*See* CFTC 56.1 ¶ 1; 7 U.S.C. § 2(c)(2)(C).)

Safety Capital and GNS, each doing business as "ForexnPower," are New York corporations. (CFTC 56.1 ¶¶ 2–3.) Safety Capital and GNS purported to provide training and education to individual investors on how to trade foreign currencies, and to conduct forex trading on behalf of investor clients using a secret trading method to make 10% monthly profit. (*Id.* ¶ 43.) GNS was registered with the Commission as a commodity pool operator ("CPO") and commodity trading advisor ("CTA") beginning on October 21, 2013. (*Id.* ¶ 3.) Safety Capital has never been registered with the Commission. (*Id.* ¶ 2.)

Won was the CEO, President, and owner of GNS. (*Id.* ¶ 4.) He was also the Vice President, Secretary, Client Relations Director, and a Board Member of Safety Capital. (*Id.*) Prior to June 2013, Won was never registered with the CFTC in any capacity. (*Id.*) Between August 2013 and February 2014, he was registered with the Commission as an Associated Person ("AP") and Branch Manager of a registered Introducing Broker ("IB") FX Evolve. (*Id.*) He was also a co-signatory on a GNS bank account at TD Bank. (*Id.* ¶ 18).

Kang was the founder and CEO of Safety Capital, and Sungmi Kang was President of Safety Capital and Vice President of GNS.  (*Id* ¶¶ 8–9.)

## II.  The Alleged Fraudulent Conduct

The Complaint alleges that Won and Kang, together with GNS and Safety Capital, of which they were controlling persons, "fraudulently solicited customers and prospective customers for the purported purpose of trading a pooled investment in connection with agreements, contracts, or transactions in off-exchange foreign currency ('forex') and/or to open retail forex accounts purportedly managed by either Safety or GNS." (*See* Compl. ¶ 1.)

### a.  Retail Forex Trading Scheme

From approximately October 2010 to December 2013, Defendants solicited and accepted customers to open retail forex trading accounts managed by ForexnPower.  (CFTC 56.1 ¶ 24.)  Forex may be traded in the "off-exchange"—also known as over-the-counter ("OTC")—market, and a retail customer—a customer with a net worth less than $10 million—who trades forex off-exchange must trade directly with a dealer, with no exchange or central clearing house to support the transaction.  (*Id.* ¶ 19.)

To solicit customers for these transactions, Defendants placed ForexnPower advertisements in Korean language newspapers and Korean language radio channels.  (*Id.* ¶ 25.)  These advertisements represented that ForexnPower had a "secret trading method" that would generate 10% or more monthly profits for customers.  (*Id.* ¶ 26.)  ForexnPower also advertised an automated trading signals program called "ASET a/k/a Super Power-Bot," which ForexnPower represented to customers would achieve 100% annual returns, even though the program never achieved even 10% in monthly profits for the majority of customers.  (*Id.* ¶¶ 27–28.)

Additionally, ForexnPower hosted Korean language seminars in Queens, New York, led by Kang, where brochures were distributed repeating the claims that customers would achieve 10%

3

monthly trading profits.  (*Id.* ¶¶ 34–39.)  Kang led these seminars and repeated the false claims that customers could obtain 10% or more monthly trading profits with no risk.  (*Id.* ¶ 34.)  Won was present at these seminars where these misrepresentations were made.  (*Id.*)  Won also assisted customers with the paperwork to open trading accounts with FXCM, a CFTC-registered Futures Commission Merchant ("FCM") and Retail Foreign Exchange Dealer ("RFED") with which ForexnPower worked.  (*Id.*)  The applications were in English, and Won did not translate the FXCM risk disclosures into Korean for ForexnPower's customers.  (*Id.* ¶ 50.)

Kang and Won's ForexnPower business cards made the same claims about "a secret trading method of generating 10% or more monthly profits" and "targeting $100,000 with $500 starting money."  (*Id.* ¶¶ 31, 33.)  ForexnPower sales materials to prospective customers included a chart purporting to show $10,000 investment turning into $1.5 million in 36 months with 10% profits every month.  (*Id.* ¶ 40.)  ForexnPower sales material also claimed the ASET/Super Power-Bot trading signals programs would achieve profits between 5–25%.  (*Id.* ¶ 37).  None of the ForexnPower advertisements or sales materials provided any risk disclosures about the risks of forex trading to their prospective customers in the Korean language.  (*Id.* ¶ 46.)

Defendants managed the trading, either directly or through ForexnPower's automated trading signals programs, for the vast majority of their clients.  (*Id.* ¶¶ 52, 63.)  None of ForexnPower's customers ever achieved 10% or more profits every month trading off-exchange retail forex contracts with ForexnPower, and the majority of Safety Capital and GNS retail forex customers suffered net losses.  (*Id.* ¶ 64.)  None of ForexnPower's customers ever had net profits in connection with trading off-exchange retail forex contracts.  (*Id.* ¶ 65.)

Throughout the duration of the scheme, Defendants made various other false representations to ForexnPower's customers, including that ForexnPower had an insurance fund to cover customer

4

trading losses after one year, that trading accounts were profiting even when customers were suffering net losses, and that ForexnPower was a registered IB. (*Id.* ¶¶ 75–79.)

### b. Commodity Pool Scheme

From approximately October 2010 to December 2013, Defendants also solicited and accepted investors in a commodity pool for the purpose of trading retail forex contracts. (*Id.* ¶¶ 81–83.) A retail forex CPO is someone who solicits pool participants and trades retail forex contracts with customer funds as a single unit. (*Id.* ¶ 83.) A retail forex CTA is someone who manages the retail forex trading of a client or customer. (*Id.*) GNS was registered with the Commission as a CPO and CTA beginning on October 21, 2013, while Safety Capital was never registered. (*Id.* ¶¶ 2–3.)

ForexnPower solicited pool investors by claiming the investment would not be risky and would be more profitable than an individual account. (*Id.* ¶ 85.) ForexnPower did not advise investors of the investment risks, did not provide account statements, did not return investments to the investors, and falsely represented that investors were achieving profitable returns even though ForexnPower was not profitable. (*Id.* ¶¶ 85–99.) ForexPower spent the entirety of some clients' investments on business expenses and salaries instead of investing the funds for forex trading. (*Id.* ¶¶ 99–100.)

### c. Failure to Comply with CFTC Subpoena

GNS and Won were both registered with the CFTC starting in October 2013—GNS as a CPO and CTA, and Won as the principal of GNS. (*Id.* ¶ 110.) In April 2014, the CFTC served an administrative subpoena returnable August 4, 2014 on GNS at its business address and Won's home address, to which GNS never responded. (*Id.*) Won acknowledged receipt of the subpoena but did not produce any responsive information. (*Id.* ¶ 111.)

## III.   Procedural History

The Commission filed the Complaint on September 24, 2015, alleging that Defendants

5

fraudulently solicited customers to trade forex in a pooled investment or to open retail forex accounts and, instead of trading forex on customers' behalf, misappropriated customers' funds for Defendants' personal use and benefit. (Compl. ¶ 1.) Specifically, the Complaint alleges six violations of the Act and Regulations:

1) **Retail forex fraud** in violation of Sections 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A) and (C), and Regulation 5.2(b)(1) and (3), 17 C.F.R. 5.2(b)(1) and (3);
2) **Fraud by a CPO or CTA (or Associated Person ("AP") thereof)** in violation of Section 4o(1)(A)-(B), 7 U.S.C. § 6o(1)(A)-(B);
3) **Solicitation and acceptance of retail forex orders from retail forex clients without being registered** in violation of Section 2(c)(2)(C)(iii)(I)(aa)-(cc), 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa)-(cc);
4) **Commingling pool funds with non-pool property** in violation of Regulation 4.20(a)-(c), 17 C.F.R. § 4.20(a)-(c);
5) **Failure to register as retail forex CPOs and CTAs** in violation of Section 4m(1), 7 U.S.C. § 6m(1), and Regulation 5.3(a)(2)-(3), 17 C.F.R. § 5.3(a)(2)-(3); and
6) **Failure to produce documents upon request from the CFTC** in violation of Regulation 1.31, 17 C.F.R. § 1.31.

Counts 1 and 2 are brought against all Defendants, including Won. Counts 3 through 5 are brought against Safety Capital and GNS, and Count 6 is brought against GNS. The Complaint alleges that Won is a controlling person of GNS and thus liable for all six counts against GNS pursuant to Section 13(b) of the Act. *See* 7 U.S.C. § 13c(b).

Won and Kang filed a joint Answer to the Complaint. (Dkt. 33.) Safety Capital and GNS did not file an Answer or appear in the case. Fact discovery has been completed. (March 17, 2022 Order.)

The Commission's Motion for summary judgment seeks a permanent injunction against Won from committing further violations of the Act and Regulations, full restitution, and imposition of a civil monetary penalty. The Commission filed an accompanying memorandum of law in support of its Motion and gave notice to Won, a *pro se* party, under Local Civil Rule 56.2. ("Pl. Mem.," Dkt. 56-1; Dkt. 56-3.) Won did not file an opposition to the Motion.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 56 governs motions for summary judgment and provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "dispute about a material fact is 'genuine' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Even if a motion for summary judgment is unopposed, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F. 3d 241, 244 (2d Cir. 2004) (quoting *Amaker v. Foley*, 274 F. 3d 677, 681 (2d Cir. 2001)).

**DISCUSSION**

**I.   Collateral Estoppel**

As a threshold matter, the Commission argues that Won is collaterally estopped from re-litigating the factual issues in the Complaint because Won was convicted in a parallel criminal case, *US v. Kang, et al.*, 18-CR-00184 (RJD)(PK) ("Criminal Proceeding"). (Pl. Mem. at 9.)

   **a.   Criminal Proceeding**

On April 11, 2018, Won and Kang were charged with securities fraud, wire fraud, securities fraud conspiracy, wire fraud conspiracy, and money laundering conspiracy in connection with "FX

7

Trading Scheme" and "Stock Investment Scheme." (CFTC 56.1 ¶ 11; *see* Indictment ("Ind."), Criminal Proceeding, Dkt. 1.[2]) The FX Trading Scheme refers to ForexnPower's fraudulent retail forex trading scheme described in Section II.a *supra*, in which:

> In or about and between October 2010 and December 2013, the defendants TAE HUNG KANG and JOHN WON, together with others, engaged in a scheme to defraud investors and potential investors in FX trading accounts managed by FOREXNPOWER through material misrepresentations and omissions relating to, among other things: (1) the experience and expertise of FOREXNPOWER's trading staff; (2) the rates of return historically achieved by FOREXNPOWER; (3) likely future rates of return that would be achieved by FOREXNPOWER's computerized trading system, also known as "ASET" or "Super Power Bot;" (4) the general risk of FX trading; and (5) an insurance program FOREXNPOWER purported to maintain, which the defendants claimed would pay investors back for any losses they incurred, plus a 10 percent profit.

(Ind. ¶ 14.)

The Stock Investment Scheme refers to a fraudulent scheme that encompasses the commodity pool allegations described in Section II.b *supra*:

> From approximately July 2011 to July 2013, the defendants TAE HUNG KANG and JOHN WON solicited investments into Safety Capital by selling Safety Capital stock. The stock was not registered with the United States Securities and Exchange Commission. In connection with the sale of this stock, KANG and WON perpetrated a scheme to defraud investors and potential investors through material misrepresentations and omissions relating to the intended use of investor funds. KANG made a variety of representations to investors and potential investors regarding how the funds invested in the company would be used, but most investors were told that their money would be pooled by FOREXNPOWER to conduct FX trading. In reality, KANG and WON misappropriated the majority of the money.

(Ind. ¶ 30.)

On March 30, 2021, Kang pled guilty to securities fraud conspiracy in violation of 18 U.S.C. § 371 and agreed to pay restitution in the amount of approximately $835,058, with $491,476 to retail forex trading victims and $343,582 to ForexnPower investor victims. (CFTC 56.1 ¶¶ 12, 104.)

---

[2] Although Exhibit 3 to the Commission's 56.1 Statement is labeled as the Indictment, it is instead a duplicate copy of Kang's plea agreement. (*See* Dkt 56-7.) Nevertheless, the Court takes judicial notice of the Indictment as filed on the public docket.

On November 9, 2021, a jury found Won guilty of wire fraud conspiracy in relation to the FX Trading Scheme and the Stock Investment Scheme; securities fraud and securities fraud conspiracy in relation to the Stock Investment Scheme; and money laundering conspiracy. (*Id.* ¶ 15.) Won was sentenced on September 15, 2022 to one year and one day of imprisonment and two years of supervised release. (*See* Letter to the Court, Dkt. 63.) The Second Circuit affirmed the judgment on appeal. (*See* Criminal Proceeding, Dkt. 203.)

### b. Legal Standard

The doctrine of collateral estoppel bars relitigation of a specific legal or factual issue in a second proceeding where:

> (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.

*Grieve v. Tamerin*, 269 F.3d 149, 153 (2d Cir. 2001). "It is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *U.S. v. Podell,* 572 F. 2d 31, 35 (2d Cir. 1978); *see also Commodity Futures Trading Comm'n v. Int'l Foreign Currency, Inc.*, No. 03-CV-3577 (DLI)(ARL), 2012 WL 13105801, at *2 (E.D.N.Y. Jan. 30, 2012); Pl. Mem. at 9 (citing cases). The Second Circuit has reasoned that:

> [t]he Government bears a higher burden of proof in the criminal than in the civil context and consequently may rely on the collateral estoppel effect of a criminal conviction in a subsequent civil case. Because mutuality of estoppel is no longer an absolute requirement under federal law, a party other than the Government may assert collateral estoppel based on a criminal conviction. The criminal defendant is barred from relitigating any issue determined adversely to him in the criminal proceeding, provided that he had a full and fair opportunity to litigate the issue.

*Gelb v. Royal Globe Ins. Co.*, 798 F. 2d 38, 43 (2d Cir. 1986) (internal citations omitted).

### c. Analysis

The Commission argues that Won is collaterally estopped from relitigating the underlying facts of his criminal fraud convictions because they closely track the Commission's allegations regarding Won's fraudulent acts in this civil enforcement action.

#### i. *Identity of Issues*

Both the Complaint and the Indictment allege that Won "engaged in a fraudulent scheme to defraud customers and potential customers through material misrepresentations regarding managed off-exchange retail forex trading accounts and the opportunity to have their funds pooled and be used by ForexnPower to trade forex." (Pl. Mem. at 10 (citing Compl. ¶¶ 20, 22, 34; Ind. ¶¶ 1, 14, 15, 30, 31, 34).) Specifically, both documents allege that ForexnPower made material misrepresentations that customers would never lose money (Compl. ¶ 34; Ind. ¶ 16), that ForexnPower had a "secret trading method generating more than 10% monthly profit" (Compl. ¶ 34; Ind. ¶ 18), and that these fraudulent solicitations occurred at seminars hosted by ForexnPower, attended by Won, at which misrepresentations were also made in, among other places, advertisements in Korean language newspapers (Compl. ¶¶ 34–37; Ind. ¶¶ 16–18).

Accordingly, I find that the identical issue of whether Won engaged in a scheme to defraud by making material misrepresentations to investors was raised in the Criminal Proceeding.

#### ii. *Actually Litigated and Decided*

After a trial, the jury rendered a guilty verdict against Won on all counts charged in the Indictment, including fraud based on the same conduct described in the Complaint. (*See* Criminal Proceeding, Dkt. 167.)

In rendering a guilty verdict on the counts in the Indictment, the jury decided these factual issues, and the judgment was affirmed on appeal. (*See* Criminal Proceeding, Dkt. 203.) Thus, the issue of Won's fraudulent conduct was actually litigated and decided in the Criminal Proceeding.

10

### iii. *Full and Fair Opportunity to Litigate*

Won was represented by competent defense counsel who, throughout the one-week trial, "was given, and took, every opportunity to challenge the admissibility of the government's evidence." (Pl. Mem. at 11.) Won also had the benefit of the heightened burden of proof and other due process protections imposed in a criminal case. Accordingly, I find that Won had a full and fair opportunity to litigate his claims during the criminal case.

### iv. *Necessary to a Valid and Final Judgment on the Merits*

Finally, the collateral estoppel doctrine only grants preclusive effect to findings that were necessary to a prior judgment. *See Int'l Foreign Currency, Inc.*, 2012 WL 13105801, at *3. The issues the Commission seeks to collaterally estop Won from relitigating are the underlying factual conclusions that the jury relied upon in convicting him. These factual determinations were necessary for a final judgment in the Criminal Proceeding and were the basis upon which the jury found Won guilty beyond a reasonable doubt.

I find that each of the four factors for collateral estoppel has been met. In the Criminal Proceeding, the government raised identical issues relating to Won's participation in the fraudulent schemes, which were litigated and decided on the merits through a jury trial; Won had ample opportunity to litigate the issues; and the conclusion was necessary to support the final judgment against Won.

## II.   Count 1 – Retail Forex Fraud, Sections 4b(a)(2)(A) and (C)

The Commission alleges that Won and GNS committed retail forex fraud in violation of Sections 4b(a)(2)(A) and (C) of the Act and Regulation 5.2(b)(1) and (3).

Sections 4b(a)(2)(A) and (C) prohibit the making of material misrepresentations, misleading statements, and/or deceptive omissions with scienter in connection with a futures transaction for or on behalf of another, including foreign currency transactions. *U.S. Commodity Futures Trading Comm'n*

11

*v. Highland Stone Capital Management, LLC*, No. 11-CV-5209 (KBF), 2013 WL 4647191 at *15 (S.D.N.Y. Aug. 29, 2013) (citing *Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 109 (2d Cir. 1986)); *see also* 7 U.S.C. § 6b(a)(2)(A), (C) (2020).  In enforcement cases, the CFTC is not required to show reliance on the misrepresentations to prove fraud.  *U.S. Commodity Futures Trading Comm'n v. Int'l Fin. Services, Inc.*, 323 F. Supp. 2d 482, 502 (S.D.N.Y. 2004).

The Commission additionally alleges that Won and GNS violated Regulation 5.2(b), which states:

> It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:
> 1) To cheat or defraud or attempt to cheat or defraud any person;
> 2) Willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or
> 3) Willfully to deceive or attempt to deceive any person by any means whatsoever.

17 C.F.R. 5.2(b)(1)-(3) (2021).

As discussed *supra*, the factual determinations necessarily made by the jury in convicting Won for conspiracy to commit wire fraud in the Criminal Proceeding also establish Won's violations of Sections 4b(a)(2)(A) and (C) and Regulation 5.2(b).  *See, e.g.*, *Int'l Foreign Currency, Inc.*, 2012 WL 13105801, at *4.  Because the elements for the wire fraud conspiracy charges on which the jury was instructed in the Criminal Proceeding encompass the elements the Commission must prove to establish the fraud charges here, and because the jury returned a guilty verdict on the wire fraud conspiracy charges, I find that Won is collaterally estopped from relitigating the elements of those charges, and the Commission is entitled to a judgment as a matter of law that Won violated Sections 4b(a)(2)(A) and (C) of the Act and Regulation 5.2(b)(1) and (3).  *See Int'l Foreign Currency, Inc.*, 2012 WL 13105801, at *4 (citing *S.E.C. v. Shehyn*, 2010 WL 3290977, at *3 (S.D.N.Y. Aug. 9, 2010) ("where a defendant's guilty plea to mail and wire fraud establish the requisite elements of securities fraud, the defendant is estopped from challenging his liability under the securities fraud statutes")).

### III.     Count 2 – Fraud by an AP, Section 4*o*(1)(A) and (B)

The Commission alleges that Won unlawfully engaged in fraud as an Associated Person ("AP") of a CPO or CTA in violation of Section 4*o*(1)(A) and (B) of the Act.  A retail forex CPO is someone who solicits pool participants and trades retail forex contracts with customer funds as a single unit. (CFTC 56.1 ¶ 83.)  A retail forex CTA is someone who manages the retail forex trading of a client or customer.  (*Id.*)  An AP is an individual who solicits orders, customers, or customer funds on behalf of a futures commission merchant (FCM), retail foreign exchange dealer (RFED), introducing broker (IB), commodity pool operator (CPO), or commodity trading advisor (CTA).  *See* 17 C.F.R. § 3.12.

Section 4*o*(1) of the Act broadly prohibits a CPO, CTA, or AP thereof, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:

> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6*o*(1)(A), (B).  Section 4*o*(1) applies regardless of whether a CPO, CTA, or AP thereof is registered under the Act.  *U.S. Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 103 (2d Cir. 2000).  The elements required to establish a fraud claim under Section 4*o*(1) are "essentially the same" as for a fraud claim under Section 4b(a)(2)(A) and (C).  *U.S. Commodity Futures Trading Comm'n v. LaMarco*, No. 17-CV-04087(ADS)(AKT), 2019 WL 4247632, at *5 (E.D.N.Y. Sept. 5, 2019) (quoting *Schwartz et. al v. O'Grady* (JMC), No. 86-CV-4243, 1990 WL 156274, at *16 (S.D.N.Y. Oct. 12, 1990)).

GNS was registered with the Commission as a CPO and CTA beginning on October 21, 2013. (CFTC 56.1 ¶ 3.)  Safety Capital was never registered with the Commission.  (*Id.* ¶ 2.)  However, because Safety Capital traded and managed retail forex contracts for customers, solicited investors in a commodity pool, and traded retail forex contracts with customer funds as a single unit, Safety Capital operated as a CPO and CTA via ForexnPower.  (*Id.* ¶¶ 81–83.)

13

Won was the CEO, President, and owner of GNS. (*Id.* ¶ 4.) He was also the Vice President, Secretary, Client Relations Director, and a Board Member of Safety Capital. (*Id.*) Although Won never registered as an AP of GNS or Safety Capital, he solicited clients for retail forex accounts and investments in a commodity pool on behalf of ForexnPower. (*Id.* ¶ 24.) Thus, Won was an AP of a CTA or CPO.

Having already found that Won is liable under Sections 4b(a)(2)(A) and (C) for retail forex fraud, and because the elements required are "essentially the same," I find that Won is also liable under Section 4*o*(A) and (B) for fraud by an Associated Person.

### IV.  Counts 3 through 6 – Won's Controlling Person Liability for GNS's Violations

Although the remainder of the Commission's claims are against GNS and/or Safety Capital and not against Won directly, the Commission alleges that Won's liability for Counts 3 through 6 is established because Won was a controlling person of GNS. Section 13(b) of the Act provides that:

> Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person.

7 U.S.C. § 13c(b). To establish controlling person liability, the CFTC must show "(1) control and (2) lack of good faith or knowing inducement of the acts constituting the violation." *U.S. Commodity Futures Trading Comm'n v. McDonnell*, 332 F.Supp.3d 641, 723 (E.D.N.Y. 2018) (citing *Int'l Fin. Services, Inc.*, 323 F. Supp. 2d at 504-05 (quoting *U.S. Commodity Futures Trading Comm'n v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002)).

Won was the CEO and owner of GNS, d/b/a ForexnPower. (CFTC 56.1 ¶ 4). Won was also a co-signatory on the GNS bank account at TD Bank. (*Id.* ¶ 18). Therefore, Won had actual control over GNS. As previously established in the Criminal Proceeding and the analysis *supra*, Won knowingly induced the fraudulent actions of GNS.

14

Accordingly, I find that Won has controlling person liability for any violations under the Act or Regulations committed by GNS.

### a. GNS's Violation of Section 4m(1) and Regulation 5.3(a)(2)-(3)

Under Section 4m(1) of the Act, it is unlawful for any CPO or CTA, unless registered, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO or CTA. 7 U.S.C. § 6m(1). Regulation 5.3(a)(2)-(3) sets forth the registration requirements for CPOs and CTAs. 17 C.F.R. § 5.3(a)(2)-(3).

It is undisputed that GNS was not registered with the Commission prior to October 2013. (CFTC 56.1 ¶ 6.) The fraudulent scheme in this case began as early as October 2010. (*Id.* ¶ 24.) GNS, d/b/a ForenxPower, used email, telephone, and the Internet to solicit and accept customers and prospective customers to open retail forex trading accounts and to invest in a commodity pool for the purposes of off-exchange forex trading. (*Id.* ¶ 23.)

Because GNS was not registered as a CPO or CTA from October 2010 to October 2013, I find that GNS violated Section 4m(1) and Regulation § 5.3(a)(2)-(3).

### b. GNS's Violation of Sections 2(c)(2)(iii)(I)(aa)-(cc)

Similarly, Sections 2(c)(2)(iii)(I)(aa), (bb) and (cc) of the Act prohibit an unregistered person from soliciting or accepting orders from a non-ECP (non-"eligible contract participant") to conduct forex transactions, from exercising discretionary trading authority over forex transactions, or from operating or soliciting funds for a commodity pool in connection with transactions in foreign currencies. 7 U.S.C. § 2(c)(2)(iii)(I)(aa)-(cc). (*See also* Pl. Mem. at 19.) Because GNS was not registered before October 2013, and it managed retail forex accounts at FXCM as early as October 2010 (CFTC 56.1 ¶ 24), I find that GNS violated Section 2(c)(2)(iii)(I)(aa), (bb) and (cc) of the Act.

15

### c. GNS's Violation of Regulation 4.20(a)-(c)

Regulation 4.20(a) requires a CPO, whether registered or not, to operate its commodity pool as a legal entity separate from that of the CPO. 17 C.F.R. § 4.20(a). Regulations 4.20(b) and (c) prohibit CPOs from receiving pool participants' funds in any name other than that of the pool and from commingling pool property with non-pool property. 17 C.F.R. § 4.20(b)-(c).

As discussed *supra*, both GNS and Safety Capital acted as CPOs and operated a commodity pool. The Commission alleges, as supported by the evidence at the Criminal Proceeding, that GNS and Safety Capital commingled pool funds with non-pool property by depositing pool participant funds in the same bank accounts used for ForexnPower's salaries and business expenses, instead of depositing customer funds into a separate bank account in the pool's name. (CFTC 56.1 ¶ 101–108).

Thus, I find that GNS violated Regulation 4.20(a)-(c).

### d. GNS's Violation of Regulation 1.31

Finally, the Commission alleges that GNS failed to produce documents upon request from the Commission in violation of Regulation 1.31. Regulation 1.31 requires a registrant to produce its books and records for inspection by any representative of the Commission upon request. 17 C.F.R. § 1.31. The Commission alleges that in April 2014, it served an administrative subpoena returnable August 4, 2014, to which GNS never responded.

Therefore, I find that GNS violated Regulation 1.31.

Because Won was a controlling person who knowingly induced GNS's violations pursuant to Section 13(b) of the Act, I find that Won is also liable for the violations by GNS as set forth above. *See* 7 U.S.C. § 13c(b).

### V.  Relief Sought

The Commission seeks injunctive relief, full restitution, and the imposition of a civil monetary penalty.

### a. Permanent Injunction

Pursuant to Section 6c of the Act, the Commission may seek a permanent injunction prohibiting a defendant from engaging in conduct that violates any provision of the Act or any rule, regulation, or order thereunder. *See U.S. Commodity Futures Trading Comm'n v. Kim*, 2011 WL 1642772, at *1 (S.D.N.Y. Apr. 15, 2011); *see also* 7 U.S.C. § 13a–1. To obtain this relief, the Commission need only show that a violation of the Act occurred and that there is a reasonable likelihood that the violation will be repeated. *U.S. Commodity Futures Trading Comm'n v. Commodity Inv. Group, Inc.*, 2006 WL 353466, at *1 (S.D.N.Y. Feb. 11, 2006) (citing *U.S. Commodity Futures Trading Comm'n v. British American Commodity Options*, 560 F. 2d 135, 141 (2d Cir. 1977)). Moreover, a district court may infer the likelihood of future violations from the defendant's past unlawful conduct. *U.S. Commodity Futures Trading Comm'n v. Kelly*, 736 F. Supp. 2d 801, 804 (S.D.N.Y. 2010) (citing *U.S. Commodity Futures Trading Comm'n v. American Bd. of Trade, Inc.*, 803 F. 2d 1242, 1250–1251 (2d Cir. 1986)).

Here, Won's past unlawful conduct indicates a likelihood of continued violations absent a permanent injunction. Won committed numerous systematic and knowing fraudulent acts of solicitation and misappropriation of customer funds over a period of many years. His action was not an isolated occurrence; rather, he engaged in a comprehensive scheme that demonstrated a pattern of intentional fraudulent behavior.

Based on these facts, I find there is a "reasonable likelihood" of future violations and, accordingly, respectfully recommend that the Court grant the permanent injunction in the manner detailed in the Commission's Proposed Order. *See* 7 U.S.C. § 13a–1(b) ("Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond"); *see also International Foreign Currency, Inc.*, 2012 WL 13105801, at *5.

17

### b. Restitution

Pursuant to Section 6c of the Act, a district court has the authority to grant ancillary relief for violations of the Act, including but not limited to, ordering restitution. 7 U.S.C. § 13a–1. Restitution is calculated as the amount of losses proximately caused by such violation. 7 U.S.C. § 13a–1(d)(3). The Second Circuit has concluded that the proper measure of restitution is the benefit unjustly received by a defendant or a defendant's illegally gotten gains. *International Foreign Currency, Inc.*, 2012 WL 13105801, at *5 (quoting *U.S. Commodity Futures Trading Comm'n v. Rolando*, 589 F. Supp. 2d 159, 173 (D. Conn. 2008)).

In the Criminal Proceeding, Kang pled guilty to securities fraud conspiracy and agreed to pay restitution in the amount of approximately $835,058, of which $491,476 would go to retail forex trading victims and $343,582 to ForexnPower investor victims.

I respectfully recommend that the Court find Won jointly and severally liable with Kang for the amount defrauded from victims and accept the Commission's proposal to order $835,058 as joint and several restitution for both Kang and Won, with credit for any restitution paid in the criminal matter. (CFTC 56.1 ¶¶ 104–109 (citing Ex. 4 to CFTC 56.1 ("Kang Plea Agreement") ¶¶ 1–2); *U.S. Commodity Futures Trading Comm'n v. AVCO Fin. Corp.*, 28 F. Supp. 2d 104, 121 (S.D.N.Y. 1998) ("Restitution is meant to make the damaged persons whole and compensate them for a defendant's wrongful acts.").)

### c. Civil Monetary Penalty

Section 6c(d)(1) of the Act and Regulations 143.8(2)(ii)-(iii) permit the Commission to seek, and give the court jurisdiction to impose, a civil penalty on any person found in the action to have committed any violation of the Act. 7 U.S.C. § 13a–1(d)(1); 17 C.F.R. § 143.8(2)(ii)-(iii). The purpose of such sanction is to further the Act's remedial policies, and deter others from committing similar kinds of violations. *International Foreign Currency, Inc.*, 2012 WL 13105801, at *6 (citing *Reddy v. U.S.*

18

*Commodity Futures Trading Comm'n*, 191 F. 3d 109, 123 (2d Cir. 1999)). During the relevant time period, the civil monetary penalty may be up to the greater of $140,000 per violation or triple a defendant's monetary gain. 7 U.S.C. § 13a–1(d)(1); 17 C.F.R. § 143.8(2)(ii)-(iii).

The Second Circuit has concluded that civil monetary penalties are appropriate where they are commensurate with the gravity of the violations found and where they reflect and seek to deter the betrayal of the public interest caused by a defendant's abuse of customers and a regulated public market. *International Foreign Currency, Inc.*, 2012 WL 13105801, at *6 (citing *Reddy*, 191 F. 3d at 128). Here, Defendants not only engaged in a systemic and deliberate scheme to defraud the public, but they deliberately exploited their access to a vulnerable community—Korean-language speakers in Queens who were totally reliant on Defendants to protect and manage their investments.

The Commission alleges that Won directly received $58,950 from the fraudulent scheme. (CFTC 56.1 ¶ 107.) Given Won's egregious conduct and to deter future conduct, I recommend that the Court grant, pursuant to Section 6c(d)(1)(A) of the Act, the Commission's request for a civil monetary penalty of triple the monetary gain (*see* Pl. Mem. at 24), which would equal $176,850 against Won. *See, e.g.*, *Int'l Foreign Currency, Inc.*, 2012 WL 13105801, at *6 (in relation to fraudulent scheme involving 32 victims and 32 separate violations of the Act, imposing penalty of $120,000 per violation for total of $3,840,000).

## **CONCLUSION**

For the foregoing reasons, I respectfully recommend that the Motion be GRANTED.

Any objection to this Report and Recommendation must be filed in writing with the Clerk of Court within fourteen (14) days of service. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to timely file any such objection waives the right to appeal the District Court's Order. *Caidor v. Onondaga*

19

*Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

*Peggy Kuo*
PEGGY KUO
United States Magistrate Judge

Dated:   August 30, 2024
         Brooklyn, New York